# Wm. W. McClellan and Wife, *vs.* John P. Kennedy, John Glenn and others.

The *compromise of a suit* to vacate a deed *advisedly made*, by which the grantor agreed to take back her property and also all that of the grantee, and to pay certain specified debts of the grantee, is a sufficient consideration to support her assumption of such debts, and the court will not look to the circumstances affecting the original suit.

Compromises, if otherwise unobjectionable, are binding, and the *right* will not prevail against the agreement of the parties.

Under the acts of 1829, ch. 216, and 1831, ch. 305, it is competent for a female eighteen years of age to execute a release to a party who *had been* her guardian, but had been removed and a new one appointed in his place, and for such party to *receive* such release.

In such case, the second guardianship had terminated by the arrival of the ward at the age of eighteen, and the second guardian had no power to receive and pass acquittances for the ward's property in the hands of the first guardian.

Settlements between guardian and ward, made recently after the office has terminated, are not favored, because the influence may be supposed still to continue; but this fact alone is not a fatal objection to a release executed by a ward.

A release after majority, based on information acquired before that time, will be upheld in equity if not otherwise objectionable.

But promises to execute a release, made by a ward when she was a mere child, are not binding upon her, and can have no effect in sustaining a release executed when she attained majority.

Admissions acted on by others, whether true or false, are conclusive against the party making them, in all cases between him and the party whose conduct he has thus influenced.

A release by a daughter eighteen years of age to her father, as guardian, but whose guardianship had ceased nine years before, made to repair wrongs done by the father to her half-sister, there being no proof of concealment, or of undue control or influence by the father over the mind of the daughter at that particular time, though gratuitous, is valid in favor of third parties who have acted upon the faith of its validity.

The record of a suit against a former guardian *alone*, to vacate a release executed to him by his former ward, resulting in a decree annulling the release, is not evidence in a subsequent suit against persons not made parties to the former suit, though interested in sustaining the release.

As a general rule, judgments and decrees cannot be used as evidence in other suits against persons who were not parties to them; but to this rule there are exceptions.

Where there is no proof of the law of another State in regard to the construction of a will executed in that State, it must be construed by the law of this State.

APPEAL from the Court of Chancery.

The record in this case is very voluminous, but the following brief statement of the material facts, together with the report of the opinion of the chancellor, in 3 *Md. Ch. Dec.*, 234, will sufficiently explain the decision of this court:

*Richard Bennet Mitchell*, about the year 1809, married Mrs. Elizabeth Bedford, the daughter of Daniel Deady, Esq., then a widow and the mother of Henrietta A. Bedford. By this marriage Mitchell had two daughters, Elizabeth and Maria, the latter of whom was born on the 9th of March 1816, and both being entitled to a large property as heirs at law of their grandfather, the said Daniel Deady, their father, Mitchell, was appointed their guardian. Mrs. Mitchell, their mother, died in 1816. On the 26th of February 1825, Mitchell *married his step-daughter* and ward, Henrietta A. Bedford, she at that time owning and being possessed of a large estate, real and personal; and on the 23rd of March following, for the nominal consideration of five dollars, she conveyed *all her property of every description* to Mitchell. In this deed she is described as "Henrietta A. Mitchell, otherwise called Henrietta A. Bedford," and acknowledges it as a *feme sole.* On the day following, another deed was executed by Mitchell and the said Henrietta, *as his wife*, and acknowledged by her as a *feme covert*, conveying the same property for the same consideration

to Thomas H. Wright, who, on the day following, (25th of March 1825,) reconveyed the same for a like consideration to Mitchell. Shortly after the execution of these deeds, the said Henrietta, (or Mrs. Bedford, as she is called in the proceedings,) became aware that her marriage *was illegal,* and her friends becoming cognizant of it and having interfered in her behalf, she left Mitchell, who, in the same year, was indicted and afterwards convicted of the illegal marriage.

Prior to his conviction, viz., on the 25th of August 1825, Mitchell conveyed all his property, including that acquired as before stated from Mrs. Bedford, to Kennedy and Glenn, *in trust,* to pay what he *might then or thereafter owe to his daughters, Elizabeth and Maria, as their guardian,* and the residue *in trust* for himself, and under this deed, the trustees, in execution of the trust, sold a portion of the property *not derived* through Mrs. Bedford. On the 16th of April 1826, Mrs. Bedford instituted proceedings, in equity, against Mitchell, Wright, Kennedy and Glenn, to vacate the deeds of March and August 1825 and recover her property. Kennedy and Glenn becoming aware of the wrong done, and being satisfied that the deeds would and ought to be vacated, an arrangement, by way of compromise, was entered into between all the parties interested, in pursuance of which Mitchell united with Kennedy and Glenn in a deed, dated the 2nd of August 1827, conveying to Mrs. Bedford all the property they had received under the deed of the 25th of August 1825, she agreeing, as recited in the deed, "to pay and satisfy all the debts due by Mitchell, *and intended to be secured and paid by and from the trust fund created by the deed of August* 1825, and also to indemnify Kennedy and Glenn for all responsibility and engagements incurred by them on account of said trust." Mrs. Bedford accordingly, on the 18th of October 1827, gave a bond of indemnity to Kennedy and Glenn, with John Hillen as surety, to indemnify them against certain debts of Mitchell set out in a schedule annexed to the bond, *and from all loss on account of any debt that might be due from Mitchell to his daughter Maria.* And on the same day she conveyed all her property to Hillen, *in trust,* to carry out her part of the agree-

ment by paying *said debts,* and to indemnify Hillen for his suretyship on her bond, and the suit was, on the 3rd of January 1828, entered "*agreed.*"

There is proof in the record to show, that whilst this arrangement was in progress, its nature, purpose and object were explained to the daughters, Elizabeth and Maria, then children, but intelligent and capable of appreciating the subject, and that they were willing to release all their claims against their father, as guardian, and expressed their determination to *execute releases* to him as soon as they attained the legal age to do so. Prior to this, *viz.,* on the 29th of June 1825, Mitchell's guardianship to these daughters was revoked by the orphans court, and on the 2nd of July following, Hillen was appointed guardian in his place. On the 17th of November 1827, Elizabeth, being then eighteen years of age, *executed a release* in due form of law to her father, as guardian, in which she admits she had received from him the balance due her by his last account, and no further claim on account thereof was ever made by her during her life, nor by her executor since her death. On the 12th of March 1834, a *similar release was executed* by Maria, she also being then eighteen years of age, (having attained that age on the 9th of the same month and year,) in which she admits that she had received from her father, as her guardian, the sum of $14,891.14, the amount due her by his account *of that date* passed with the orphans court. Both these releases were under seal, acknowledged before a justice of the peace and recorded in the orphans court.

In the mean time, Hillen paid all the debts mentioned in the schedule annexed to the bond of indemnity out of the property conveyed to him by the deed of the 18th of October 1827, and on the 2nd of April 1834, conveyed back to Mrs. Bedford what property remained in his hands discharged from all trusts whatever, and this conveyance she accepted as a final settlement of Hillen's trust.

Subsequently, on the 11th of December 1837, Maria Mitchell married Wm. W. McClellan, who, with his wife, in May 1838, filed a bill in equity against Richard Bennett Mitchell, the object of which, among other things, was to vacate and set

30　　v.8

aside the release executed by the said Maria, on the 12th of March 1834, upon the ground that it was without consideration, and was obtained by the undue and despotic influence of Mitchell over his said daughter and ward. The result of this proceeding was a decree, passed on the 31st of July 1840, *vacating the release.* But this bill made no reference to the deeds mentioned above, and no one was made defendant thereto except said *Mitchell alone.* The record also shows, that the same parties also instituted suit upon Mitchell's guardian's bond, in which suit this release was relied upon and a verdict rendered in favor of the defendants, upon which a judgment of *non pros.* was entered on the 14th of October 1844.

The release having thus been set aside, McClellan and wife, on the 15th of December 1841, filed the *present bill* in chancery against Mrs. Bedford, Mitchell, Kennedy, Glenn, the executors of Hillen and of Elizabeth Mitchell, the object of which is to make the property conveyed to Kennedy and Glenn by the deed of the 25th of August 1825 responsible for the debt due by Mitchell to his daughter Maria, the wife of the complainant, McClellan. The allegations of this bill and the answers thereto, and the testimony then taken in the case, are sufficiently stated in the report of the chancellor's opinion, in 3 *Md. Ch. Dec.*, 234. Pending these proceedings, Mrs. Bedford died in the city of New York, leaving a will, by which she devised all her property to trustees, in trust for the use of her daughter during her natural life; and in case of her marriage, to pay the yearly income thereof to her husband during the marriage, and after her death, to hold the same for the use of the lawful heirs of her body till such heirs arrive at lawful age; and "if her said daughter should die without lawful issue," then the whole of her property to be left to her brother, Dr. Gunning S. Bedford, and his heirs. The testimony of this brother, which was taken in this case by agreement as if under an order of court, (he having been made, as the executor of Mrs. Bedford and one of the trustees named in her will for her daughter, a party to the suit,) was excepted to by the complainants upon the ground of interest under this will. The defendants also excepted to the admissibility in evidence of the record of the case

of *McClellan & wife, vs. Mitchell*, in which the *release* was set aside, upon the ground that though parties in interest, they were not made parties to that suit.

On the 11th of January 1853, the chancellor delivered the opinion, which is reported in 3 *Md. Ch. Dec.*, 234, and in which he disposed of the case so far as the property which originally belonged to Mrs. Bedford was concerned, but it having been suggested in argument, that a portion of the property which had passed to her by the deed of the 2nd of August 1827, originally belonged to *Mitchell*, and that *this*, in any event, was responsible for complainants' claim, the chancellor reserved his opinion on this point and directed a commission to issue to take testimony thereon. Under this commission a large mass of proof was taken by both parties, the purport of which sufficiently appears from the following opinion of the chancellor, (Johnson,) delivered upon the 4th of February 1854, accompanying his decree dismissing the bill absolutely:

" In the opinion delivered by this court on the 11th of January 1853, but a single question was reserved, and that related to such property, if any, as Richard Bennet Mitchell may have owned, not derived from Henrietta A. Bedford. With reference to the estate which he acquired from her in the mode set out in the proceedings, my opinion was clear and decided, that the complainants had no title whatever to relief, and I was prepared at once to dismiss the bill.

" The proof taken since has produced no change in that opinion, and I shall therefore now confine myself to a very brief explanation of the reasons which satisfy me the complainants can have no relief, even with regard to the property which originally belonged to R. B. Mitchell and which was conveyed to Henrietta A. Bedford by the deed of the 2nd of August 1827.

" It is very certain that if the release of Mrs. McClellan is valid the complainants can have no relief of any kind or to any extent. The attempt which has been made since the last opinion was delivered, by the introduction of proof of Mitchell's tyrannical conduct towards, and influence over his

daughter, Maria, (the present Mrs. McClellan,) to show that the release was improperly obtained, has, in my opinion, been unsuccessful. It appears to me to be very satisfactorily shown, that Mrs. McClellan executed this paper uninfluenced by any motives but such as would naturally and properly determine the conduct of one standing in the relation which she occupied towards a suffering party, upon whose property and prospects her father had perpetrated such an inexpiable wrong.

"It would be a useless waste of time to recapitulate the circumstances going to prove that she acted under the pressure of no undue influence in executing the release. They will be found in the report of the former case in 3 Md. Ch. Dec., 234, and will, I am persuaded, notwithstanding the evidence subsequently introduced, conduct to the conclusion then arrived at, that in executing that instrument she was performing 'an advised, unbiased and voluntary act, wholly uninfluenced by her father or any one else.'

"It is not pretended that her sister, Elizabeth, who likewise released her father, was controlled by him, or that she was like Mrs. McClellan, the victim of his brutal disposition. Why then did Elizabeth release? Clearly, as I think, because it was the deliberate and settled purpose of these two sisters to make all the reparation in their power to one so cruelly wronged by their father; or if that was not their motive it was the result of a family arrangement, which, for reasons appealing powerfully to female susceptibilities, they never designed to disturb. It may be affirmed, I think, with entire confidence, that Mrs. McClellan would not have been disposed to re-open these transactions of her own accord, and bring them with their attendant painful and mortifying circumstances again to the public gaze.

"It is very certain, that during her single life, from March 1834 to her marriage with the complainant, William, in December 1837, she did nothing to call in question the validity of the release, I consider myself therefore warranted in saying, from all the facts disclosed in the record, that the release was her free and voluntary act, emanating from motives and founded upon considerations which recommend it to the favor of a court of equity.

"Upon the former argument it was intimated that Mrs. Bedford, by means of the conveyances contained in the record, had acquired parcels of property which belonged originally to Richard B. Mitchell, and in view of the circumstances of the case, it occurred to me, that with regard to such property, (if any such should be shown,) the equities of the parties might entitle the complainants to relief. Proof upon this point has since been taken, and although it is shown that a part of the property conveyed by the deed of the 2nd of August 1827, to Mrs. Bedford, did originally belong to Richard B. Mitchell; it likewise appears, by what I regard as competent and admissible evidence, that she engaged to pay, and there has in fact been paid, out of her own estate, in discharge of debts due by Richard B. Mitchell, more than his property was worth. This being the case the complainants have no equity, even with regard to this property, to be relieved from the operation of the release. I consider the evidence of Mr. Scott, to whose competency as a witness no exception can be taken, as quite sufficient to establish the fact adverted to, and I am persuaded, notwithstanding the objections which have been interposed to the character of his proof, that it may be used defensively and in support of the *bona fides* of the entire transaction. *Clagett vs. Hall*, 9 *G. & J.*, 81.

"The proof of Mr. Kennedy is, I think, also admissible, though a party to the suit. He was examined under an order, and I am of opinion, that under the circumstances of the case, he could not, in any event, be made personally responsible for costs. He has acted in good faith throughout, and it would be inconsistent with the uniform course of the court to render a trustee, under such circumstances, responsible for costs.

"There is moreover another fact brought to light by the recent proof, which goes strongly in support of the defendants' case. I refer to the letter from the complainant, William W. McClellan to Mrs. Bedford, under date the 23rd of December 1840, proposing to purchase from her certain annuities, a part of which was originally owned by R. B. Mitchell. This letter is, in my judgment, a full recognition of her title, with knowledge of all the facts, including the decree of 1840, in

which in a suit to which Mrs. Bedford or those claiming under her *were not parties,* the release had been set aside.

"The decree setting aside the release was passed in June 1840. It was upon a bill against Richard B. Mitchell only, and consequently cannot be used for any purpose against Mrs. Bedford and those claiming under her. Yet it is reasonable to presume, that the complainants who obtained would be disposed to attribute to it some degree of efficacy. It seems, however, the complainant, Mr. McClellan did not, at least that he did not then, suppose that it exposed to the claim he now sets up, the property which had been conveyed to Mrs. Bedford.

"Being then of opinion, upon all the proof in the cause, that the equity as well as the law of the case is with the defendants, I shall pass a decree dismissing the bill with costs."

From the decree so passed the complainants appealed.

The cause was argued before LE GRAND, C. J., TUCK and MASON, J.

*Charles F. Mayer* for the appellants, argued:

1st. If even the court may infer undue influence from the relations of Mitchell and Henrietta, necessarily vitiating her original conveyances to him, yet she *has renewed and made valid, by her subsequent acts when unrestrained and independent,* the claim of Mrs. McClellan against the whole estate of the trust to Kennedy and Glenn, and that charge against the estate is not now to be annulled, *and especially not by her, but her representatives,* upon antecedent objections thus *foregone by herself.*

2nd. The charge for Mrs. McClellan's claim is available at least against *all the estate of Mitchell himself* embraced in the trust and remaining unsold, and against Henrietta's for *the value of all that has been sold* of Mitchell's original property so embraced: and her selling her own original estate or his *to pay debts, not, as will be observed, provided for by the trust,* cannot be at Mrs. McClellan's expense, and cannot affect the scope and integrity of the trust charge for benefit of her claim if the charge have any validity at all.

3rd. The orphans court accounts of Mitchell's guardianship are proof of his indebtment to his ward Maria. 2 *G. & J.*, 235, *Iglehart vs. The State.* 7 *Gill*, 367, *Richards & Wife, vs. Swan, et al.*

4th. The decree annulling the release *obtained* by Mitchell from Maria, is evidence against the *defensive testimony* of that release. 2 *G. & J.*, 235, *Iglehart vs. The State.* 12 *Wheat.*, 515, *Drummond vs. Prestman.* *Mitf. Pl.*, 160, 171. 1 *Greenlf. on Ev.*, secs. 180, 181, 187, 189, 527, 527 *(a.)* The question in this case on this point is not one of *party* but of *privity.*

5th. If that decree has not that effect here, the testimony taken in this cause shows that the release could not have been and was not voluntarily given, and is void.

6th. The release is founded, and for any effect *depends* on the recital of payment as the only consideration for it, and no payment having, as confessed, been made, the releasing clause of the writing fails of all operation whatsoever. 1 *Story's Eq.* secs. 317 to 322. *Mitf. Pl.*, 261. 3 *G. & J.*, 103, *Fridge vs. The State.* 5 *Gill*, 29, *Forbes vs. Forbes.* *Acts of* 1829, *ch.* 216, *sec.* 7, and 1831, *ch.* 305, *secs. 4 and* 7. 5 *Md. Rep.*, 219, *Miller & Mayhew, vs. Williamson, et al.*

7th. The acts of Assembly above referred to, as to releases from wards of eighteen years of age, do not apply to the case of a person who, at a period immediately antecedent to the release, was not a guardian, but who at such period had in his place *another as guardian,* and which actual guardian *had vested in him the claim of the ward against the displaced guardian.*

8th. These acts of Assembly serve only to give a *prima facie* validity to such releases as this, and do not mean to dispense with the obligation upon the guardian to pay his ward, especially where a payment, as here, is made the avowed ground for the release, even if that objection be considered as complied with, *until the contrary is shown,* where the solemnities of the acts of Assembly are observed. At utmost the statute provisions only avail to absolve the guardian from the operation of the general principle, that in his dealings for acquittance with his ward *he must show his actual transaction*

and approve it to the court's judgment to make the act good against the ward.

9th. All parties acting upon the faith of this release are bound to the result of any inquiry into its validity and by the test of all the finally developed facts relating to it, and the understanding *(not even with the infant herself, but with an interested and exacting father,)* that she was to give a release, and had, *then only ten years old,* promised to grant one, is too preposterous a ground for contract, *and to work a forfeiture of the infant's rights,* to be treated as part of the muniment of Hillen's, or Kennedy's and Glenn's, or Henrietta's, action or pretension.

10th. Conceding validity even more than *prima facie* to the release as concerns *personal liability* in Kennedy and Glenn, and in Hillen, it must be open for inquiry as to its *bona fides,* and if at its recited foundation of actual payment untrue, cannot operate in reference to the *real security* sought here to be made available.

11th. This being a case for the enforcement of a *real security* the statute of limitations cannot apply, nor any bar of time short of at least twenty years, even if, *as is not the fact here,* the trust for our claim had terminated by *an adverse position assumed and notified to us by our trustees.* A trustee's violation of the trust is no such hostile repudiation of a trust, and operates only to put the party in whose favor the violation has occurred in place for all charge against the trust property of the delinquent trustee. 11 *G. & J.,* 217, *Magruder vs. Peter.* 6 *Md. Rep.,* 71, *Eschbach vs. Pitts. Ibid.,* 201, *Stump vs. Henry. Ibid.,* 418, *Bowie vs. Stonestreet.*

12th. The testimony of Kennedy and of Bedford, and of Scott, is inadmissible from their interest in the case, and if not obnoxious for that, is in itself incompetent as but hearsay, opinion and surmise, and as against written evidence of deeds and contracts.

*S. T. Wallis* for the appellees, argued:

1st. That the deeds of March 1825, professing to transfer to Mitchell all the property of his step-daughter and supposed

wife, Henrietta A. Bedford, were procured from her by fraud and duress, and were consequently void. Mitchell held the property subject to her equities, none of which could be divested by any act of his except in favor of a *bona fide* purchaser for value without notice. Mrs. McClellan (as against Mrs. Bedford) was no such purchaser, and the title which Kennedy and Glenn took from Mitchell as trustees for her benefit was liable to be impeached in their hands, precisely as it might have been in Mitchell's. 8 *How.*, 183, *Taylor vs. Taylor*. *Hill on Trustees*, 156, 157. 1 *Story's Eq.*, secs. 307, 309, 323. 2 *H. & G.*, 40, *Lowry vs. Tiernan*. 3 *Whart.*, 493, *Twelves vs. Williams*. 22 *Pick.*, 243, *Clark vs. Flint*. 4 *Paige*, 221, *Dickerson vs. Tillinghast*. 1 *Sme. & Mar. Ch. Rep.*, 49, *Rowan vs. Adams*. 20 *Pick.*, 337, *Holland vs. Cruft*. 10 *Paige*, 180, *Padgett vs. Lawrence*. 1 *Dev. Ch. Rep.*, 106, *Donaldson vs. Bank of Cape Fear*. 10 *G. & J.*, 420, *Jones vs. Hardesty*. *Act of* 1777, *ch.* 12, *secs.* 1, 6, 15.

2nd. That the terms of the reconveyance from Glenn and Kennedy to Mrs. Bedford; her bond of indemnity given to these gentlemen, and her own conveyance to Hillen, are not to be taken separately or together as any relinquishment by her of her equities, or any acceptance of the trusts with which Mitchell had sought to encumber the property. All of these matters we insist were the direct result of the original frauds practised by Mitchell upon her, and were inevitable under the circumstances in which these frauds had placed her.

3rd. That Mrs. McClellan's release to Mitchell, executed when she was of lawful age, is a conclusive bar to the relief sought by the bill. There is no evidence in these proceedings to affect its validity, and the decree invalidating it as against Mitchell is not admissible here, having been obtained in a proceeding in which none of the appellees in interest *were parties or privies*. The release extinguishing the debt necessarily extinguishes the remedy, as well against the property originally Mitchell's, which may have passed to Mrs. Bedford, as against that which was originally her own. *Story's Eq.*

*Pl.*, *secs.* 257, 427.   4 *H. & J.*, 521, *Hayward vs. Carroll.* 4 *Gill*, 114, *Griffith vs. Turner.*

4th. That by the evidence of Scott and Kennedy, and the other proof in the case, Mrs. McClellan's release is affirmatively shown to have been fairly and understandingly executed so far as it involved a surrender of all claim against Mrs. Bedford's estate. Mrs. Bedford's difficulties were adjusted on the faith of Mrs. McClellan's promise, that she would execute the release as soon as she should be legally competent therefor. On the same faith Mrs. Bedford assumed to pay, and did pay, a large amount of Mitchell's debts, for which neither she nor her property could otherwise have been made liable. On Mrs. McClellan's arrival at the proper age she redeemed her promise by the execution of the release, and Hillen, on the faith of such actual execution, reconveyed the whole property to Mrs. Bedford on the 2nd of April 1834, thereby closing the whole transaction after it had been nine years pending. The complainants, we therefore insist, are absolutely estopped from now calling the validity of the release into question. 5 *Md. Rep.*, 220, *Miller & Mayhew, vs. Williamson.* 1 *Story's Eq.*, sec. 132.

5th. That the property originally belonging to Mitchell himself, which he conveyed in trust to Kennedy and Glenn, and which they may have conveyed to Mrs. Bedford, is not responsible to the complainants in this proceeding any more than the property which was originally Mrs. Bedford's. The debts of Mitchell, which Mrs. Bedford assumed and paid, were larger than the value of his said original property, and he was besides indebted to her for portions of her estate which he had wasted. Moreover the conveyance to her by Kennedy and Glenn was but a part of the compromise into which the promise by Mrs. McClellan to release substantially entered, and which it is not competent now for the complainants to disturb. These considerations, we insist, give an affirmative support to the release over and above its effect as a technical bar, as already suggested in the third point.

6th. That the evidence of Scott and Kennedy is properly before the court, they being individually competent to testify,

and the matter of their evidence being excluded by no rule of equity. 1 *Greenlf. on Ev., sec.* 420. 1 *Bland,* 268, *Lingan vs. Henderson.*

7th. That the demand of the complainants is barred by limitations, even if Mrs. Bedford was affected by the terms of the trust, the deed of Hillen of April 2nd, 1834, reconveying the property to her, having declared the trusts to be satisfied, and she having therefore claimed adversely to the trusts for a longer period than three years anterior to the institution of this suit. 2 *Story's Eq., secs.* 1520, 1521. *Angell on Lim.,* 171, 172. 3 *G. & J.,* 389, *Green vs. Johnson.* 2 *H. & G.,* 236, *Strike vs. McDonald.* 3 *Gill,* 169, *Allender vs. Vestry of Trinity Church.* 11 *G. & J.,* 230, *Magruder vs. Peter.* 3 *Gill,* 160, *Dugan vs. Gittings.* 4 *Md. Rep.,* 362, *Young vs. Mackall.* 3 *Do.,* 367, *Hertle vs. Schwartze & McDonald.* 6 *Md. Rep.,* 336, *McDowell vs. Goldsmith,* and the same case in 2 *Md. Ch. Dec.,* 390. 7 *Johns Ch. Rep.,* 90, *Kane vs. Bloedgood.* 9 *Simons,* 570, *Dearman vs. Wyche.* Besides this, McClellan himself *recognised* Mrs. Bedford's title to this *very property* by his written offer to purchase it at its full value, made in 1840.

8th. That the whole case of the complainants on the pleadings and proof is inequitable, and entitled to no countenance from a court of justice. The claim is prosecuted, as shown by the proof, against the wishes of Mrs. McClellan, and was never intended to be set up by her. It was not mooted until her marriage with McClellan, and then not until after his letter of December 23rd, 1840, in which he expressly treated the whole property in controversy as Mrs. Bedford's, and offered her full value for it, thereby negativing all claim or pretence of lien upon it on his part or his wife's. The state of Mrs. McClellan's intellect since her marriage, as shown by the appellant's own proof, is such as to divest the case of all moral support, if any, it might otherwise derive from an intelligent effort on her part to cancel her solemn release and appropriate her sister's means to the payment of her father's debts.

*John Nelson* for the appellants, in reply:

The bill in this case proposes to affect property held in *two*

*rights,* viz., that which originally belonged to Mitchell and that which originally belonged to Mrs. Bedford. The foundation of our claim is an *acknowledged indebtment* by Mitchell to his daughter, Mrs. McClellan, as her guardian. This claim was originally secured by *deed of trust* to Kennedy and Glenn of the 25th of August 1825, was *recognized* by the subsequent deed to Mrs. Bedford of the 2nd of August 1827, the bond of indemnity to Hillen and the subsequent conveyance by Mrs. Bedford to Hillen, and by all the proceedings in the case. If the property was now in the hands of the trustees, Kennedy and Glenn, there could be no doubt of the propriety of a decree to sell the land to pay this admitted *lien* of ours upon it. And, apart from any defences, it could be sold in whosesoever hands it might be found. Now what are the defences? They are:

1st. Admitting that our claim is well founded as against Mitchell, the guardian, it is said that it has been *released.*

2nd. If not released that the claim is *barred by limitations.*

3rd. If not released and not barred, yet that the deed of the 2nd of August 1827, as well as the preceding deeds, was a fraud upon Mrs. Bedford, and that her peculiar circumstances and equities are a complete bar to the claim now set up.

1st. Is the *release* a bar to our recovery? The answers admit that the money was due to the ward by the guardian and was never paid. Now was it *competent* for the ward to execute this release to this party? This depends upon the acts of 1829, ch. 216, and 1831, ch. 305. The first of these acts, as we interpret it, does not extend to cases of releases to a party who had ceased to be guardian for more than nine years, and when another party had been appointed guardian in his place, in whose keeping the ward's interest then was. 3 *G. & J.,* 103, *Fridge vs. The State.* The act of 1831 does not *change the law* upon this subject, and its 4th section is applicable to a *particular class of cases only,* viz., of releases to guardians, acknowledged *out of the State.* If then these acts do not apply how stands the case? It is admitted that the money was due. At the time the release was *promised* the ward was but *eleven years of age,* and from that time until

she attained the age of eighteen she was continually *taught to believe* and *instructed to think* that it was her bounden duty to execute this paper. She was all this time under the absolute and despotic control of her father and guardian. The record is full of proof to this point. Three days after she attained the age of eighteen years she executed this release for more than $14,000, *without receiving one cent therefor.* Now a release executed under such circumstances is *not valid,* either in law or equity. 1 *Story's Eq.,* sec. 317.

But again this release has been *decreed null and void* by a court of competent jurisdiction. The record of that case is clearly evidence against *Mitchell,* and why is it not evidence against the *other parties* to this suit? They are *claiming under* Mitchell, under the deed from him to Mrs. Bedford of the 2nd of August 1827. The case of a judgment against a *principal* in a bond being *evidence against* a *surety* is analogous, and, as we think, conclusive upon this point. 2 *G. & J.,* 245, *Iglehart vs. The State.* 12 *Wheat.,* 515, *Drummond vs. Prestman.* The case of *Beall vs. Beck,* 3 *H. & McH.,* 242, is explained in 12 *Wheat.,* and in the view of this explanation is *sanctioned* by the court in 2 *G. & J.,* 245, and otherwise it is overruled. The only case to the contrary is that in 4 *Gill,* 113, and that was decided upon the *particular terms of the guaranty* there in question, and depends upon matter *in pais* and not upon a *judgment* which imports *verity.*

There was no acquiescence on the part of Mrs. McClellan. In May 1838, she and her husband filed the bill to *vacate this release.* All the other evidence shows that she and her husband were pressing her claim against Mitchell and of course disregarding the release.

2nd. The next point is as to the question of limitations. The bill was filed on the 15th of December 1841. Mrs. McClellan came of age on the 9th of March 1837. The claim therefore clearly was not barred at law, because she had ten years, after arriving at age, within which to file her bill. The only action at law which could be brought was on the guardian's bond, and of course limitations would not apply. But

we say that the doctrine of limitations has no application whatever to this case. The claim here is against the property as a *specific lien* in the hands of a trustee, and as to such a *lien* limitations will not run. The claim could not be enforced *at law*, either against Mrs. Bedford or Kennedy and Glenn. It is purely a matter of equity over which that court alone can take cognizance. 2 *Story's Eq.*, sec. 1521, *(a.)* 11 *G. & J.*, 217, *Magruder vs. Peter.* 6 *Md. Rep.*, 201, *Stump vs. Henry.* The case of *McDowell vs. Goldsmith*, 6 *Md. Rep.*, 332, decides no other point, for it was not a case of a *specific lien* but simply a *general lien* resulting from the relation *of debtor and creditor.* Now what and where is the *repudiation of this trust?* There is none such in the case. The deed from Hillen to Mrs. Bedford is nothing more than an *absolute conveyance* of this property with *full knowledge* of this claim.

3rd. Now as to the supposed peculiar equities of Mrs. Bedford. There is no evidence of *fraud* in obtaining these deeds. There was certainly none on the part of McClellan. All the unfortunate transactions disclosed by this record have been brought here *by the defence and not by us.* There is no evidence of undue influence except that of this illegal marriage. Mitchell, Glenn and Wright all deny the existence of this influence in their answers to the bill of 1826, to set aside these deeds. In this aspect of the case the arrangement for the settlement of that suit was made. And Mrs. Bedford from time to time *acknowledged* and recognised this claim of Mrs. McClellan. The testimony of Dr. Bedford, relied on as showing fraud and undue influence, is inadmissible, because he has a direct interest in the case as devisee in remainder of his sister, Mrs. Bedford. It is true her will, according to the law of this State, would pass no interest to him, but in New York, where the will was executed and where the parties, both testator and devisee, resided, the law is *different*.

4th. But surely the deed of 1825 is valid so far as the property of *Mitchell himself*, thereby conveyed, is concerned, for he was clearly competent to convey his *own property* to pay this debt due by him to his daughter. There is *no fraud in this.* It was conveyed upon the *special trust* that it should be

applied to *this very claim.* The parties had no authority subsequently to divest the trust or the property from the purpose of paying this claim expressly secured by the deed of 1825. The new debts and claims paid by Mrs. Bedford for Mitchell cannot be set-off against this undisputed claim of ours thus secured by the deed of 1825.

TUCK, J., delivered the opinion of this court.

Whatever might have been the result of the proceedings instituted by Mrs. Bedford, in April 1826, to vacate the deeds of March and August 1825, if that case had not been compromised, there cannot be entertained a reasonable doubt that the property mentioned in the deed from Glenn, Kennedy and Mitchell to her, dated the 2nd of August 1827, and by her conveyed to Hillen, on the 18th of October of the same year, was thereby made responsible for the claim of Mrs. McClellan against her father, and also for the debts of R. B. Mitchell contained in the schedule filed in the cause. Mrs. Bedford was then not only free from the control of Mitchell, but attended by persons of character and intelligence, who appear to have been anxious to vindicate her rights and to assist in such measures as might be best adapted to redress, as far as the nature of the case would allow, the grievous wrongs which had been inflicted upon her by one whom the law had placed in *loco parentis,* as well by reason of marriage with her mother as by the assumption of the duties of guardian. Pending a controversy as to the validity of the deeds of 1825, and as a compromise and settlement of that suit, the conveyances of 1827 were executed, in which the claims of third persons against R. B. Mitchell were provided for and intended to be secured. It is true these persons had no claim upon Mrs. Bedford, but they were creditors of Mitchell, who, while holding the legal title to the property, had charged it with the claims of his daughters, by the deed of August 1825, with a reservation of the surplus to himself; and by the compromise of the suit involving the validity of the deeds, Mrs. Bedford agreed to take back her own property and also all that Mitchell owned charged with these debts, the schedule debts having

been substituted in the place of Mrs. Elizabeth Mitchell's claim, which was covered by the deed of August 1825. We think that the compromise of this suit was a sufficient consideration to support her assumption of the debts, and that we ought not now to be influenced by circumstances affecting the subject matter of the original suit, satisfied as we are that Mrs. Bedford acted advisedly, and under the counsel of friends in every way competent and disposed to protect her interests in such an emergency. "If compromises are otherwise unobjectionable they will be binding, and the right will not prevail against the agreement of the parties, for the right must always be on one side or the other, and there would be an end of compromises if they might be·overthrown upon any subsequent ascertainment of right contrary thereto." The doctrine of compromises rests on this foundation. 1 *Story's Eq.*, *secs.* 131, 132. Hence we say, that the property must remain charged under the terms of that settlement, unless it has been released by the act of the parties or by operation of law.

In answer to the appellants' claim, reliance is placed:— *first*, on the release executed on the 12th of March 1834; *secondly*, on the plea of limitations; and *thirdly*, on the superior equities of Mrs. Bedford, and of the defendants claiming under her, over those suggested in behalf of Mrs. McClellan; either of which defences, if sustained, will entitle the appellees to an affirmance of the decree.

We have no doubt that Mrs. McClellan was competent to execute, and her father to receive, such a release, for the reasons assigned by the chancellor. 3 *Md. Ch. Dec.*, 252. We do not concur in the view taken here on the part of the appellants, that Mitchell could only have made a settlement with Hillen, the second guardian. When this paper was executed the guardianship of Hillen had terminated, and he had no power to receive and pass acquittances for property or money in her father's hands. This he might have done before Mrs. McClellan attained the age of eighteen, but after that time the power to release devolved on her, and he could no more have concluded her by any settlement with Mitchell than he could have maintained, in his own name as guardian, a suit for the amount due.

In applying this defence, we must bear in mind that the present controversy is not between the appellants and R. B. Mitchell alone. In this view of the case, it is of little moment whether the release was obtained by improper means or not. There is no pretence, as we understand, that the account in the orphans court did not show the correct balance, or that she was denied opportunity to inform herself on that subject. But the allegation is, that the release was not her free and voluntary act, having been extorted by the despotic influence of her father.

It is true that settlements between guardian and ward, recently after the office has terminated, are not favored, because the influence may be supposed still to continue; but this fact alone is not a fatal objection. In *Forbes vs. Forbes, 5 Gill,* 29, a release was sustained, though made only twelve days after the arrival at age; and the conduct of the parties anterior to the release, though occurring during the minority, were held to be connected with and to form the basis of the release; among which acts was a settlement between the trustee and his *cestui que trust,* and the execution by the latter of a release, during his minority, discharging the former from a complicated trust of many years standing. This case shows, that a release after the majority of the party, predicated on information acquired before that time, will be upheld in equity if not otherwise objectionable. In the case before us, the account of the guardianship had been stated by the proper tribunal several years before the date of the release, the last one merely adopting the balance then appearing to be due, with interest added to the time of the release. There does not appear to have been any concealment, nor is there evidence of any undue control by the father over the mind and conduct of his daughter at that particular time. His guardianship had ceased nine years before, and she was no longer under the influence of that relation.

It is said, however, that his authority, as parent, was improperly exerted, although the office of guardian had terminated. This record discloses conduct on the part of this father towards his own child which the strongest language is scarcely adequate to condemn, but in the absence of evidence to show

32    F.8

that this paper was executed under the coercion of such ill-treatment, and with such inducements moving her to follow the example of her sister Elizabeth, who had executed a release of her claim, we are not prepared to pronounce it void as against these defendants. We lay out of view the testimony of witnesses as to the explanations which were made to Mrs. McClellan, and the understanding of all parties, herself included, while these arrangements were in fieri, and when she was a mere child. There would be an end to the protection which the law affords to persons of tender years, if they could be held liable for promises made under such circumstances, when controlled more by excited feelings than the unbiassed exercise of a judgment well informed as to their rights and duty. But as this lady advanced in life, and became more sensibly alive to the degraded condition into which her father had plunged the family, she too may be supposed to have formed a resolution to heal her sister's wounds by this tender of sympathy, and as far as she could, repair her wrongs by closing up all matters of business growing out of that unhappy connection. It is reasonable to infer from their affectionate intercourse, that she was governed by these considerations, and although this conclusion depends in a great measure on the probable suggestions of the human heart in cases like the present, the inference is as just, and entitled to as much respect in reaching her motives, as to suppose that the father's general ill-treatment—though he was not always unkind—was her only inducement to this act, in the absence of facts bearing upon the transaction, at, or immediately before the time it occurred. Besides the considerations of affection likely to have operated on Mrs. McClellan, we find Mr. McClellan himself, in 1840, offering to purchase this property from Mrs. Bedford at its full value, which must be taken as a recognition of her title, as dependent upon the release, because in the absence of that discharge from this debt, Mrs. Bedford had no title to the property clear of this incumbrance.

But, as we have said, this is not a case solely between the parties to that release. Other persons have acted upon it, and made settlements, and parted with securities, under the belief,

as we must suppose, that it operated a full and valid discharge of Mitchell, and of all who had bound themselves for his default as guardian, and they are now parties defendants maintaining its integrity. That the release is an acknowledgment by Mrs. McClellan of the receipt of the money, at a time when she had authority to make the acknowledgment, cannot be doubted. It is well settled, that "admissions which have been acted upon by others are conclusive against the party making them, in all cases between him and the party whose conduct he has thus influenced; and it makes no difference whether the thing admitted be true or false, it being the fact that it has been acted upon that renders it conclusive." 1 *Greenlf. on Ev.*, secs. 207, 298.   *Gresley's Eq. Ev.*, 353. Now, the deed to Hillen provides that on payment of the claims mentioned the property was to be reconveyed to Mrs. Bedford. He paid all these debts except that of Mrs. McClellan's. If he had gone to her for information after she attained the age of eighteen, and been informed by her that she was fully paid, and that she had no longer any claim against her father as guardian, can there be a doubt that this would have authorized him to reconvey the property, according to the terms of the trust? Instead of this personal application, however, he found the admission on the record to which he was authorized to apply for information, (*Miller & Mayhew, vs. Williamson, et al.*, 5 *Md. Rep.*, 231,) and acted upon it, without any imputation against its fairness. Is the admission made in one form less conclusive than when made in the other? We think the parties are protected in either case. It is not to be treated as the act of an infant; for the law declares that the instrument "shall have the same effect and operation in law in every respect, and to all intents and purposes, as if such female were of the full age of twenty-one." It cannot be supposed that the framers of the law intended that such receipts, acquittances and releases, should have no effect as evidence of the facts asserted by them. When Hillen had such evidence of the payment of her demand, there was no longer any necessity for the parties to keep the trust open to meet contingencies depending on the validity of an instrument which they had

no reason to suppose they would afterwards be called upon to vindicate, and, accordingly, we find that on the 2nd of April 1834, he reconveyed the residue of the property to Mrs. Bedford, thus abandoning the only security he held for his bond of indemnity to Glenn and Kennedy, and at the same time giving up to Mrs. Bedford the property which, while in their hands under the deed of August 1825, was charged with Mrs. McClellan's claim, and which she accepted as a final settlement of the trust. These acts having been predicated on Mrs. McClellan's own acknowledgment of satisfaction, must operate to prevent, as between these parties, any inquiry into the circumstances under which that acknowledgment was made.

In answer to this defence, it is shown, on the part of the appellants, that the chancery court had declared the release to be void before this bill was filed. It would be a great hardship, not to say fraud, under all the circumstances of this case, if these defendants were bound by that decree. When that bill was filed the appellants must have known of the deeds mentioned in these proceedings, and, consequently, that Mrs. Bedford, Glenn, Kennedy and Hillen, had a very important interest in sustaining the release which the appellants then sought to condemn as void. They might have been made parties, for, in that proceeding, under proper averments, all the issues presented by this record could have been tried. There was no necessity, in point of law, for that release being first removed out of the way, with a view to this bill. There are cases in which judgments and decrees may be used as evidence in other suits, against persons who were not parties to the decree, but these are exceptions to the general rule, and the present does not in any sense belong to that class of cases. The decisions most relied on by the appellants are *Iglehart vs. State,* 2 *G. & J.,* 235, and *Drummond vs. Prestman,* 12 *Wheat.,* 515. But it is shown, in the case of *Griffith vs. Turner,* 4 *Gill,* 114, that the guaranty in 12 *Wheaton* authorized the confession of the judgment which was relied on as evidence against the guarantor; and that the judgment in the other case, (2 *G. & J.,* 235,) was placed on the peculiar char-

acter of the instrument by which the surety's responsibility was incurred. This is the plain case of a decree against one person being offered in evidence against another, not a party nor in privity with any party thereto, and is no more admissible here against the defendants, than would be the verdict and judgment against the appellants in their suit against the sureties on the guardian's bond, in which, as appears by the record, this same release was contested. *Hunter vs. Hatton,* 4 *Gill,* 115.

We are also of opinion that the appellants have no claim against the property which did not originally belong to Mrs. Bedford. It must be remembered that the deed to her was the result, in part, of the compromise of the chancery suit, and that her deed to Hillen was also part of that settlement, and that for a consideration, as we have said, she dedicated that property to the payment of certain claims. In our view of the case it matters not whence the property came originally. The question is, whether it has been released, by the parties interested, of the trusts charged upon it? and we think that what has been said as to the release applies with equal force to all this property. Besides, the record shows that Hillen paid from Mrs. Bedford's means quite as much as this property was worth, in discharge of Mitchell's debts, according to the terms of the trust, and we cannot perceive on what principle of equity it can be taken from her representatives for the purpose of paying the claim of Mrs. McClellan in the face of her release.

For these reasons, and without considering the other defences set up by the appellees, we think the decree of the chancellor should be affirmed.

The exceptions filed by the appellants to certain evidence offered by the defendants below were properly overruled. The witnesses objected to had no interest in the result. The trustees had been discharged by the act of Mrs. McClellan; and as to the supposed interest of Dr. Bedford under his sister's will, we have no proof of the New York law as to such dispositions of property, and, clearly, under the laws of this State he can take nothing under the will, the limitation to him being too remote.

*Decree affirmed with costs.*